The **NEW AMSTERDAM CHEESE CORP.** et al., Plaintiffs,

v.

**KRAFTCO CORPORATION,** Defendant.

No. 68 Civ. 4713.

United States District Court,
S. D. New York.

Aug. 13, 1973.

Arutt, Nachamie, Benjamin & Rubin, New York City, for plaintiffs, by Abel Jack Schwartz, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant, by Michael A. Cooper, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge.

This case was placed on the Ready Reserve Calendar, all discovery and inspection having been completed and the parties having agreed to a Pretrial Order. The defendant now moves for summary judgment on the basis of the stipulation of facts contained in the Pretrial Order.

This action is for damages for alleged violations by the defendant of the antitrust laws, more particularly Section 1 of the Sherman Antitrust Act (15 U.S. C.A. § 1); Section 3 of the Clayton Act (15 U.S.C.A. § 14); and Section 2(e) of the Clayton Act, as amended by the Robinson-Patman Act (15 U.S.C.A. § 13(e)).

The defendant Kraftco Corporation is a Delaware corporation engaged in the purchase, manufacture, processing and distribution of dairy and other food products in the United States and foreign countries. It operates through various unincorporated divisions. Two of these divisions are involved in this action: the Breakstone Sugar Creek Foods Division and the Kraft Foods Division, both of which are engaged in the manufacture and distribution of various processed dairy products, including cheeses. Breakstone distributes mostly the soft white cheeses while Kraft distributes the hard and yellow cheeses. The only point in the spectrum of processed dairy foods where the two divisions "compete" is with cream cheese; Kraft selling "Philadelphia Brand Cream Cheese", while Breakstone distributes cream cheese under the Breakstone name.

The plaintiff Merchants Food Distributors Co-op, Inc. (hereinafter referred to as "Merchants") is a New York cor-

poration organized under the Cooperative Corporations Law. All of the other plaintiffs are New York corporations except East County Foods Co., which is a partnership, and all are shareholders and members of Merchants. Merchants basically runs a warehousing facility for dairy and other food products at the Bronx Terminal Market. The other plaintiffs distribute the foodstuffs from Merchants to various wholesale and retail outlets in New York City and a small part of Westchester County.

The plaintiffs not only distribute the products of the defendant but also competing brands, including Borden's, Inc., which has a significant part of the relevant market.

Prior to the fall of 1964, the plaintiffs distributed both the Breakstone and Kraft lines of products sold by the defendant. At about that time, Lawrence Becker, then President of the Breakstone Division of defendant Kraftco, told plaintiffs that thereafter they would be permitted to deal in either the products of Breakstone or of the Kraft Division, but not both. In December 1964, the plaintiffs opted to handle the Breakstone line of goods and so advised the Kraft Division that they were no longer handling the Kraft line. Since that time plaintiffs have sought to purchase products from the Kraft Division of the defendant but such offers to purchase have been rejected.

The motive behind Becker's ultimatum to the plaintiff is in sharp dispute. The plaintiffs assert that its purpose was to put them out of business, while the defendant maintains that its purpose was to allow the plaintiffs to concentrate more fully on one product line. However, the defendant, for purposes of this motion, claims that the motive or intent, no matter how heinous it may have been, has no bearing on the resolution of this case.

According to the Pretrial Order, under the caption "Plaintiffs' Conten-

tions", the plaintiffs indicate that they will:

". . . introduce evidence to support their argument that the discontinuance of the handling of the Kraft line by them was brought about by undue pressures exerted upon them by the President of the Breakstone Division. Evidence will be introduced to prove that this forced discontinuance of the Kraft line was *a result of a conspiracy that was agreed upon between the officials of the Breakstone Division.* The plaintiffs withdraw their allegations that conspiracies existed between the Breakstone Division and the Kraft Division or between the Breakstone Division and the Kraftco Corporation. The plaintiffs will introduce evidence to prove that the practices of the defendants (sic) in the forced discontinuance of the Kraft line, followed up by the continued refusal to deal with them by Kraft, amounted to such discrimination as to cause them severe loss of business profits and business good will." (Emphasis supplied).

The defendant bases its motion for summary judgment on the stipulated facts and particularly on the above paragraph of the Pretrial Order.

The first count of the Complaint alleging violation of Section 1 of the Sherman Act must fall, the defendant maintains, because there is not alleged the concert of action between or among two or more persons or entities capable of entering an unlawful "contract, combination . . . or conspiracy" prohibited by that section. The defendant contends that unnamed [1] "officials of the Breakstone Division" acting in their corporate capacity cannot be said to have unlawfully acted in concert within the meaning of Section 1. I agree.

As Judge Gurfein of this Court stated in GAF Corp. v. Circle Floor Co., 329

---

[1]. None of the officials of Kraftco, Inc., its Breakstone Division or its Kraft Division, is named as a defendant in this action.

F.Supp. 823, 827 (S.D.N.Y.1971) aff'd, 463 F.2d 752 (2d Cir. 1972):

"A *statutory* conspiracy laid under Section 1 of the Sherman Act requires the participation of at least two 'independent business entities' . . . That is the very nature of the conspiracy charge in the context of the Sherman Act—a concert of action between persons in trade."

Agents of the same corporation cannot be considered "independent business entities" and therefore are not capable of entering such a statutory conspiracy.

The plaintiffs recognize this as the general rule but insist that this case constitutes an exception to the rule. They argue that the decision by Becker of the Breakstone Division requiring the plaintiffs to discontinue either the Breakstone or Kraft Division line was not "normal" or in the "day-to-day" or "ordinary" scope of his duties in carrying out his management responsibilities to the corporation. From this they ask the Court to infer that in making the decision Becker was not acting as an agent of the corporation, but rather as an individual.

This argument is not buttressed by any factual allegations in either the Complaint or the Pretrial Order. On the contrary, plaintiffs virtually concede in paragraph 22 of the Complaint that the officials of the Breakstone Division, including Becker, were going about the corporate business with a primary purpose of gain for the corporation. While there may be a difference of opinion as to the motive or intent behind Becker's decision, there is no claim that it was made for anything other than corporate gain. Under these circumstances, it is impossible to find that the officials of the Breakstone Division could have caused the defendant to conspire with itself or with them to violate the Sherman Act.

In dealing with a similar argument in Nelson Radio & Supply Co., Inc. v. Motorola, Inc., 200 F.2d 911, 914 (5th Cir. 1952), cert. denied, 345 U.S. 925, 73 S. Ct. 783, 97 L.Ed. 1356 (1953), the Court ruled:

"It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can . . . . [I]t appears plain to us that the conspiracy upon which plaintiff relies consists simply in the absurd assertion that the defendant, through its officers and agents, conspired with itself to restrain its trade in its own products. Surely discussions among those engaged in the management, direction and control of a corporation concerning the price at which the corporation will sell its goods, the quantity it will produce, the type of customers or market to be served, or the quality of goods to be produced do not result in the corporation being engaged in a conspiracy in unlawful restraint of trade under the Sherman Act . . . . [N]o conspiracy could possibly exist under the facts disclosed. The Act does not purport to cover a conspiracy which exists merely in the fact that the officers of the single defendant corporation did their day to day jobs in formulating and carrying out its managerial policy. The defendant is a corporate person and as such it can act only through its officers and representatives. It has the right as a single manufacturer to select its customers and to refuse to sell to anyone for any or no reason whatsoever. It does not violate the Act when it exercises its rights through its officers and agents, which is the only medium through which it can possibly act."

The same reasoning applies here. Absent the requisite "contract, combination . . . or conspiracy" required to prove a violation of Section 1 of the Sherman Act, it follows that summary judgment must be entered dismissing Count I of the Complaint.

The defendant also moves to dismiss Count II of the Complaint which in sum

alleges a violation of Section 3 of the Clayton Act (15 U.S.C.A. § 14). That statute provides in relevant part:

> "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . of a *competitor or competitors* of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." (emphasis added).

Plaintiffs would agree that the Breakstone Division of defendant and the Kraft Division of defendant are not separate competing entities in the classic sense. However, plaintiffs contend that the use of unincorporated divisions by the defendant is merely a device to circumvent the antitrust laws. Plaintiffs argue that the two divisions are *de facto* separate entities with different officers, etc., and that they compete with each other, particularly in the cream cheese area.

The question is thus squarely raised, apparently for the first time,[2] whether unincorporated divisions of a single corporation can be "competitors" of each other *within the meaning of Section 3 of the Clayton Act*. For the reasons given below I hold they cannot.

An argument similar to the plaintiffs' was made in the context of the Sherman Act and rejected by the 9th Circuit Court of Appeals in Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). There the plaintiff, Hawaiian Oke, alleged that the four unincorporated divisions of the House of Seagram, Inc., a wholly owned subsidiary of Seagram and Sons, Inc., had conspired to terminate their dealings with the plaintiff as their distributor. The judge instructed the jury to consider the four divisions as separate entities for the purpose of determining whether there had been a conspiracy. The Court of Appeals held this portion of the charge to be erroneous, explaining its decision at length:

> "Once the theory that 'divisions' or other internal administrative units of a single corporation can 'conspire' with each other is accepted, we can see no sensible basis upon which it can be decided that, in one case, there has been a conspiracy and that, in another, there has not. No corporation of any size can operate without an internal division of labor between various of its officers and agents. The larger the enterprise, the more necessary such internal units become. Moreover, sound management demands extensive delegation of authority within the organization. Yet, under the trial court's ruling, the more delegation there is, the more danger there will be that the holders of such delegated authority will be found by a court to be capable of conspiring with each other in carrying on the corporation's business, as in this case, where the trial court so held as a matter of law." 416 F.2d at 83–84.

A similar danger arises if divisions of a corporation are held to be competitors of each other within the meaning of Section 3. It is undisputed that the defendant Kraftco Corporation could refuse to sell to the plaintiffs either its Kraft product line or its Breakstone product line or both. McElhenney Co. v. Western Auto Supply Co., 269 F.2d 332 (4th Cir. 1959); Technical Tape Corp. v. Minnesota Mining & Mfg. Co., 247 F.2d 343, 358 (2d Cir. 1957), cert. denied, 355 U.S. 952, 78 S.Ct. 537, 2 L.Ed.2d 529 (1958); Leo J. Meyberg Co. v. Eureka Williams Corp., 215 F.2d 100 (9th Cir.), cert. denied, 348 U.S. 875,

---

2. Neither counsel nor this Court have been able to find a case where this question was discussed or decided.

75 S.Ct. 113, 99 L.Ed. 689 (1954). It would be anomalous to hold that it may not delegate this decision to the president of one of its divisions without violating the Clayton Act. Under the corporate system of management, even when such a decision is made by the head of a division, it is in fact a management decision of the corporate whole.

In this case, the corporation's concurrence in Becker's decision was made clear, if not earlier, at least when the plaintiffs attempted to renew their distribution of the Kraft line and the offer was repeatedly refused by the Kraft Division. It would require a severe distortion of the stipulated facts of the Pretrial Order to characterize this willing acquiescence by the Kraft Division in Becker's decision as "market foreclosure of a competitor" within the reach of Section 3. See Stokes Equipment Co. v. Otis Elevator Co., 340 F.Supp. 937 (E. D. Pa.1972).

■ The underlying purpose of Section 3 of the Clayton Act was to prohibit certain conduct which Congress felt was anti-competitive and destructive to the free market system. Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); Dictograph Products, Inc. v. Federal Trade Commission, 217 F.2d 821 (2d Cir. 1954), cert. denied, 349 U.S. 940, 75 S.Ct. 784, 99 L.Ed. 1268 (1955); Judson L. Thomson Mfg. Co. v. Federal Trade Commission, 150 F.2d 952 (1st Cir. 1945), cert. denied, 326 U.S. 776, 66 S. Ct. 267, 90 L.Ed. 469 (1945); Stokes Equipment Co. v. Otis Elevator Co., supra, 340 F.Supp. 937 (E.D. Pa.1972). The Act was aimed at preventing the exclusion of one manufacturer-seller's products from the marketplace as a result of the coercive actions of another seller-manufacturer. Congress felt that the decision as to whether a product

were to be sold ought to be made by the seller-manufacturer of that product and an uncoerced buyer.[3]

There have been two classic applications of Section 3. It has been used to strike down "tying contracts" where a seller requires a buyer to purchase an undesired article in order to obtain a desired oftentime patented one. Of necessity this results in the foreclosure of the market to other manufacturers of the undesired article, whose wares may, in fact, be better. International Salt Co., Inc. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); International Business Machine Corp. v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936); United Shoe Machinery Corp. v. United States, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1922).

Secondly, the section has been used to attack exclusive dealing contracts where one manufacturer-seller requires a buyer to buy only his products and none of his competitors'. Again, the courts have made it clear that a seller-manufacturer's access to a market is being limited or foreclosed by the actions of a separate and independent manufacturer, and that if the exclusion is from a subtantial market, then it is illegal. Tampa Electric Co. v. Nashville Coal Co., supra, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

■ In the present case, it can in no sense be said that one entity was foreclosing a market to a separate and independent entity. Clearly, Breakstone and Kraft are not separate competitors since the ultimate policy decisions regarding Kraft and Breakstone sales and distribution are made in concert. The evil to which Section 3 was aimed is not present here.

What the plaintiffs here in essence seek is to have this Court weave a corporate veil where there is none so as to

3. Both the Senate and the House of Representatives, when considering the Clayton Act, in addition to citing the importance of a seller's right to sell his own goods, also emphasized the right of the buyer, albeit limited, to deal in any manufacturer's products he saw fit to handle. H.R. Report No. 627, 63rd Cong., 2nd Sess. (1914), Senate Report No. 698, 63rd Cong. 2nd Sess. (1914).

permit the allegation that two unincorporated divisions of the defendant are "competitors". But there is no basis, other than the difference in products and their differing names, for making separate entities of these divisions. The profits from each division are represented in one corporate balance sheet. Any competition between the two divisions would not improve the balance sheet. It would be a case of moving the profits from one pocket to another when both pockets are in the same pair of pants. To claim that the divisions are competitors is thus completely illusory.

█ The fact that the two divisions produce similar products under different brand names is not controlling. The use by one manufacturer of two different brand names is an accepted commercial practice. It does not make the manufacturer a "competitor" of itself. Nor is it significant that the divisions were once separate corporations. The argument that the "de-incorporation" was a sham or a mere "shuffling of papers" was raised and rejected as unsubstantiated in Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., *supra*. Here, as there, plaintiff has failed to allege any factual basis for such an argument.

Accordingly, Count II of the Complaint must be dismissed.

The defendant has also moved to dismiss Count III of the Complaint. Basically, that Count alleges in the broadest possible terms violations of the Clayton Act, as amended by the Robinson-Patman Act. In their memorandum in opposition to this motion, plaintiffs indicate that this cause of action is based on 15 U.S.C.A. § 13 and more particularly subsections (a), (d) and (e) thereof, which provide as follows:

"(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like trade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States, . . . and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . ."

\*       \*       \*       \*       \*       \*

"(d) It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities."

"(e) It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms."

The parties have stipulated that both before and after December 1964 (when plaintiffs stopped selling the Kraft Division products), the defendant sold both the Breakstone and Kraft lines to various other distributors which were in direct competition with plaintiffs.

The defendant's refusal to sell both lines of merchandise to the plaintiffs constitutes, according to the plaintiffs, an unlawful discrimination under the subsections of Section 13 quoted above. But, it is clear that the defendant could lawfully refuse to deal at all with the plaintiffs. Section 13(a) itself contains a proviso to the effect:

"That nothing herein contained shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade. . . ."

See, e. g., Joseph E. Seagram & Sons v. Hawaiian Oke Liquors, Ltd., *supra*; McElhenney Co. v. Western Auto Supply Co., *supra*; Dublin Distributors v. Edward & John Burke, Ltd., 109 F.Supp. 125 (S.D.N.Y. 1952).

And termination of one distributor in favor of another has been upheld as perfectly lawful and not in restraint of trade under the Clayton Act as amended by the Robinson-Patman Act. Timken Roller Bearing Co. v. Federal Trade Commission, 299 F.2d 839 (6th Cir. 1962), cert. denied, 371 U.S. 861, 83 S.Ct. 118, 9 L.Ed.2d 99 (1962); Naifeh v. Ronson Art Metal Works, 218 F.2d 202 (10th Cir. 1954); Tripoli Co. v. Wella Corp., 286 F.Supp. 264 (E.D.Pa.1968), aff'd, 425 F.2d 932 (3rd Cir. 1970), cert. denied, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970).

It would therefore seem to follow that the defendant can lawfully refuse to deal in part of its line without creating a violation of the antitrust laws. This conclusion has been reached by at least two other courts. Dipson Theatres v. Buffalo Theatres, Inc., et al., 86 F. Supp. 716 (W.D.N.Y. 1949), aff'd, 190 F.2d 951 (2d Cir. 1951); L. S. Good & Co. v. H. Daroff & Sons, Inc., 263 F.Supp. 635 (N.D. W.Va. 1967). In *Dipson*, the plaintiff-

manager of movie theatres claimed that the defendant film distributors discriminated against him in violation of Section 13 by reducing the number of second run films available to one of his theatres in favor of another nearby theatre. The court held that as long as the distributors acted independently of each other, which they had, the plaintiff had no remedy for such a partial refusal to deal. In L. S. Good & Co. v. H. Daroff & Sons, Inc., *supra*, the defendant manufacturer first allowed the plaintiff distributor to distribute all its lines of men's wear, but later withheld one product line because it had promised an exclusive dealership in this line to another distributor. Again the plaintiff was held to have no remedy under the antitrust laws.

The Robinson-Patman Act amending the Clayton Act was aimed at price discrimination in its various forms. Federal Trade Commission v. Simplicity Pattern Co., 360 U.S. 55, 79 S.Ct. 1005, 3 L.Ed.2d 1079, rehearing denied, 361 U.S. 855, 80 S.Ct. 41, 4 L.Ed. 2d 93 (1959). But plaintiffs make no claim of any price discrimination; the complaint is merely one of discrimination in not selling to plaintiffs the whole line of dairy products (and other products) from both of defendant's divisions. Such discrimination is not one of price proscribed by subsection (a), nor one of payment for services or facilities proscribed by subsection (d), nor even one of furnishing services or facilities proscribed by subsection (e).

I therefore hold that the alleged discrimination is insufficient to constitute a violation of Section 13, and that Count III must also be dismissed.

Accordingly, summary judgment will be entered for defendant. No costs are to be allowed.[4]

Settle order on notice.

---

4. The plaintiffs are also suing the defendant in State Court for violation of an alleged exclusive franchise agreement and also apparently for a prima facie tort. The assessment of costs should abide the resolution of that action.